## FIRST NAT. BANK IN HEMPHILL v. CROCKER et al.
## No. 2613.

Court of Civil Appeals of Texas. Beaumont. Feb. 21, 1935.

Minton & Minton, of Hemphill, for appellant.

Bell & McDougald, of Beaumont, for appellees.

WALKER, Chief Justice.

On the 10th day of October, 1927, J. A. Harley and wife deeded to T. F. Crocker a certain tract of land in Sabine county for the consideration, in part, of a series of eight vendor's lien notes, each for the sum of $59.75, maturing yearly on the 1st day of November, with interest at the rate of 8 per cent. per annum and 10 per cent. additional as attorney's fees; both in the note and in the deed a vendor's lien was retained against the land to secure the payment of the notes. On or about the 19th day of October, 1927,

all of these notes were lawfully transferred to Senator W. R. Cousins, who, on or about the 27th day of January, 1928, transferred all of them to the First National Bank of Hemphill, indorsing them and guaranteeing their payment. That bank was subsequently liquidated and its assets transferred to the First National Bank in Hemphill, appellant herein. In 1928 a payment of $40 was made upon the principal amount of note No. 1; on the 20th day of September, 1929, a payment of $42.75 was indorsed on this series of notes, but subsequently erased. On the 25th day of March, 1932, appellant instituted this suit, upon the above-described notes, against T. F. Crocker and Senator Cousins as indorser and guarantor. The maker answered by plea of general demurrer and general denial, Senator Cousins answered by a similar plea, and further that, for a valuable consideration, he had been released from his indorsement and guaranty. In substance, the special answer was that all parties agreed that Crocker should deed the land back to Mrs. Harley; that she should execute to the bank her note for the amount due on the Crocker notes; that the bank should accept her note in lieu of the Crocker note; that Senator Cousins should be released and the Crocker notes surrendered to Crocker. It was further pleaded that certain rent was due Crocker on the premises; that Senator Cousins claimed the right to appropriate this rent on the payment of the vendor's lien notes; that Crocker owed an individual note to the bank in addition to the vendor's lien notes which the bank wanted paid; that in the agreement by which Senator Cousins was released all parties consented and agreed that the bank should have this rent money and apply it as a credit on Crocker's individual note. By reason of the facts thus pleaded, Senator Cousins prayed that he be released from his indorsement and guaranty. The bank made no defense of innocent purchaser; no issue on the liability of the maker was submitted to the jury.

On the issues between appellant and appellee Senator Cousins, the jury found the following facts: (1) Appellant agreed to accept the note of Mrs. Harley "instead of the note sued upon"; (2) at all times after November 1, 1929 (the date of the settlement), Mrs. Harley was ready and willing to execute the note as per her agreement with appellant; (3) appellant represented to appellee Cousins that it was accepting Mrs. Harley's note "in place of the note sued upon"; (4) appellee Cousins relied upon the representations of

appellant; (5) appellant prepared a deed for execution by Crocker "for the purpose of transferring the lands involved in this cause to Mrs. Harley"; (6) at all times after November 1, 1929, Crocker "was ready and willing to execute such deed"; (7) appellant represented to appellee Cousins "that he was released from all liability on the indebtedness sued upon; (8) appellee Cousins "relied upon such representations"; (9) "there was a consideration for the release." In connection with issue No. 9, the following definition of "consideration" was submitted to the jury: "In this connection the Court instructs you that the term 'Consideration' means something of value passing to the First National Bank of Hemphill from the defendant Cousins, or some third party, or the refraining by the defendant Cousins from the doing of some act which he had a right to do, and the failure to do which resulted in the loss of something of value to the defendant Cousins."

On the verdict of the jury and the undisputed evidence, judgment was entered in favor of appellant against T. F. Crocker for $715.26, the amount of the notes, principal, interest, and attorney's fees, with foreclosure of the vendor's lien as prayed for; and in favor of appellee Cousins that he "go hence without day, and be discharged from any and all liability asserted against him herein, and with his costs in this behalf expended." All issues submitted to the jury had support both in the pleadings and in the facts. Mr. Crocker was to deed the land back to Mrs. Harley, Mr. Harley having died since the execution of the original deed. Mrs. Harley was to execute to the bank her note for the amount of the Crocker notes, in lieu of the Crocker notes. The Crocker notes were to be canceled and surrendered to Crocker. Senator Cousins agreed to waive his claim to the rent money as a credit on the Crocker notes and that the amount of the rent money should be paid to the bank on an individual note of Crocker. Senator Cousins, by virtue of the agreement, was to be released, and in fact was released, from his guaranty and indorsement, that being the very terms of the agreement as made between the parties on or about the 1st day of November, 1929. It was further agreed as a part of this transaction that Mrs. Harley should take possession of the premises as her own, which she did, and appropriated the proceeds of the premises. It was further agreed that appellant should prepare the deed to be executed by Crocker to Mrs. Harley and the note to be executed by Mrs.

Harley to appellant, and to present these papers to them for execution. These papers were, in fact, prepared under the direction of the bank, but never presented for execution. The testimony was further to the effect that Mr. Crocker was at all times after the agreement ready, able, and willing to execute the deed, and that for a reasonable time after the agreement Mrs. Harley was ready to execute the note. The evidence was further to the effect that Senator Cousins relied on the agreement that he was released, made no further claim to the rent money on the premises due in the fall of 1929, and dealt with the First National Bank of Hemphill at all times subsequent to the agreement and prior to its liquidation on the theory that he had been released, and from the date of the agreement in November, 1929, to the liquidation of the bank in 1931, no further demand was made upon Senator Cousins for payment of the note. We quote as follows from the testimony of Senator Cousins:

" * * * The bank had a note against Crocker which wasn't a land note and he had moved to another county. Now if they could go over there and get Crocker to come in and apply the rent that Mrs. Harley and I had a right to apply on the note then they would satisfy themselves with Mrs. Harley, and had I not been released I would have been up there demanding that that rent go on those land notes, and that is the reason I was so positive about being released.

" * * * The bank wanted to get Crocker's money and would rather hold Mrs. Harley than Crocker, and they were trying to get that property back in Mrs. Harley with those notes so that they could hold Mrs. Harley and collect Crocker's note independent of a land note.

" * * * Mrs. Harley was to get the land back. She was to satisfy the bank. I think Mr. Pate told me that may be—may be before and after, I had several conversations— she was to make satisfaction with the bank and I was to be released. I know she wanted her home back. (Mr. Pate was representing the bank.)

" * * * Q. The point I am getting at is, Mr. Cousins, who told you you were released? A. I know that Mr. Pate told me— and there was a conversation with Mr. Pratt and me about the matter.

" * * * When they said I was released from liability the matter was naturally dismissed from my mind.

" * * * I walked to the bank and asked Mr. Pate 'Now I am released', which wasn't

necessary but simply as a matter of precaution, and of course Mrs. Harley wasn't an educated woman—a good woman, but hard to understand, and she had her own family troubles, and I was getting loose from the transaction so that I wouldn't be worried any more about it, and so I walked up and asked if I was released, and he said 'Yes, you are released.'

"* * * Mr. Pratt, who was in the bank, told me that the land notes were better than a note. He wanted the Crocker note paid—the $250.00, and in that conversation he said he believed in the notes more than he believed in Crocker."

Mr. Pate, the cashier, testified:

"Q. Do you know who was to procure the execution of that deed? A. I was the one. When I talked to Mr. Crocker he told me he was living somewhere on the other side of Bronson, and I told him at the time—I told him I would either bring it to him or send it to him by mail, and the reason I didn't was because I was afraid if I mailed it he would lay it aside and forget it, and I intended to go over there and present it myself."

Mr. T. F. Crocker testified:

"A. I told Mr. Pate that I was willing to let them have the place back, and he was to have a deed drawn up back to Mrs. Harley, and he was to send me the deeds through the mail or bring them, and I never did get the deeds.

"Q. After that what did you do in reference to the place? A. Not anything—nothing no more than collected the rent.

"Q. You collected that year's rent? A. Yes sir.

"Q. And it was applied on another note? A. Yes sir.

"Q. Then what did you do next year with the place? A. Nothing.

"Q. Who had the place next year? A. I think Mrs. Harley took it back in charge.

"Q. And who had it the following year? A. I don't know who worked the place.

"Q. Mrs. Harley took it back after you talked to Mr. Pate about the deed? A. Yes.

"Q. She took the place back? A. Yes sir.

"Q. Have you had the place since then, or farmed it? A. No sir."

Mrs. Harley testified:

"Q. Was there any conversation at that time with reference to your taking the property back? A. Yes sir.

"Q. What was that? A. I told them I would take it back if they would make my deeds, and they said they would but they said I wouldn't need them.

"Q. Who said that? A. Mr. Pate said I didn't need them—the old deed wasn't recorded, but they would make me one as soon as they could, and for me to go ahead with the place and attend to it and see after it.

"Q. Now at that time what was said with reference to rent, if anything? A. Well, the bank got the rent. I don't know what went with it. I suppose it was applied on Mr. Crocker's notes. I don't know if it was applied on the land notes or his other notes, but the rent went to the bank. * * *

"Well, they just promised to make the deed, and he said he could get the deed and some time he would get Mr. Crocker to sign it—but I never did get the deed.

"Q. Now after that time what did you do in reference to the place? A. I just turned it over to one of my son-in-laws, and told him if he would take up the notes and pay off the land he could take the place in charge. I wasn't able to keep it up.

"Q. But you did take charge of the place? A. Yes sir.

"Q. State what if anything you did in reference to the payment of those notes or any other indebtedness against the place, after that? A. Well, I paid the loan off on that place, and the taxes that year.

"Q. On this place here? A. Yes, sir, on that place.

"Q. What loan was that? A. Well, it is in the federal loan.

"Q. The first lien? A. Yes sir.

"Q. And you paid that in 1929? A. Yes sir.

"Q. Did you make any other payments on it? A. Well, I think I paid it off in 1930 too.

"Q. Were any payments made on taxes do you know? A. I believe we kept the taxes and the loan paid up two years on the place, and I haven't paid any more."

■ ■ No citation of authorities is necessary to support the conclusion that the testimony, as summarized, raised the issue of a valuable consideration from Senator Cousins to the First National Bank of Hemphill for the agreement whereby he was released from his indorsement and guaranty. The evidence also satisfactorily answers appellant's contention that the agreement was, not that Senator Cousins was to be released when the deed and notes were executed by Crocker and

Mrs. Harley, but that he was, in fact, released upon his agreement that Mrs. Harley's note could be executed in lieu of the Crocker notes. The evidence also denies appellant's contention that it was not to prepare the deed and note for execution, and that in preparing them it was the agent of Mrs. Harley and Mr. Crocker. The issue was satisfactorily raised, if not established as a matter of law, that the bank prepared the deed and the note as a part of the agreement originally entered into.

■ Appellant presents assignments against question No. 9, but, as no exceptions were reserved in the lower court against this question and the court's definition of "consideration," these assignments cannot be considered.

The evidence, as summarized, is a satisfactory answer to appellant's proposition that it was entitled to an instructed verdict and to the additional assignment that the issue of consideration from Senator Cousins to the bank was not raised.

■ The court did not err in refusing to submit to the jury the following special issue requested by appellant: "From a preponderance of the evidence, what was the consideration for the release by First National Bank of Hemphill to W. R. Cousins, if you have found that there was a consideration for said release, if any?"

Every element of this question was satisfactorily covered by the charge actually submitted.

It follows that the judgment of the lower court should in all things be affirmed, and it is accordingly so ordered.